Opinion of May, 29, 2008 Withdrawn








 

Opinion
of May, 29, 2008 Withdrawn.  Motion for Rehearing En Banc Denied as Moot. 
Reversed and Rendered and Substitute Opinion filed June 4, 2009.

 

 

In The

 

Fourteenth Court of
Appeals

____________

 

NO. 14-06-00835-CV

____________

 

MERCK & CO., INC., Appellant

 

V.

 

CAROL A. ERNST, INDIVIDUALLY AND AS PERSONAL
REPRESENTATIVE OF THE ESTATE OF ROBERT CHARLES ERNST, DECEASED,  Appellee

 



 

On Appeal from the 23rd
District Court

Brazoria County, Texas

Trial Court Cause No. 19961*BH02

 



 

S U B S T I T U T E   O P I N I O N

Appellee=s motion for rehearing en banc is
denied as moot.  The opinion of May 29, 2008, is withdrawn and the following is
substituted therefor.  








Merck
& Co., Inc. (AMerck@), appeals from a jury verdict in a personal-injury and
wrongful-death suit filed by Carol Ernst in which she alleged that ingestion of
Vioxx caused the sudden cardiac death of her husband, Bob Ernst.  Merck raises
four issues in which it challenges the legal and factual sufficiency of the
evidence to support the jury=s verdict on causation, strict liability, negligence, malice,
and damages.  Merck further contends that the trial court erred in instructing
the jury and in admitting certain evidence.  Finding the evidence to be legally
insufficient on the issue of causation, we reverse the trial court=s judgment and
render judgment that appellee take nothing.

I.  Background

Vioxx, known generically as rofecoxib, belongs to a general
class of pain relievers known as non‑steroidal anti‑inflammatory
drugs (ANSAIDs@).  NSAIDs work by
inhibiting cyclooxygenase (ACOX@), an enzyme that
stimulates synthesis of prostaglandins, which are chemicals produced in the
body that promote certain effects.  Traditional NSAIDs, such as Advil (ibuprofen),
Aleve (naproxen), and Voltaren (diclofenac), have been longstanding treatment
options for patients needing relief from chronic or acute inflammation and pain
associated with osteoarthritis, rheumatoid arthritis, and other musculoskeletal
conditions. This relief, however, has historically come with significant
adverse side effects.  Specifically, traditional, NSAIDs greatly increase the
risk of gastrointestinal perforations, ulcers, and bleeds (APUBs@).  This risk is
further increased when high doses are ingested, which is often necessary to
remedy chronic or acute inflammation and pain.








In the early 1990s, scientists discovered that the COX
enzyme had two formsCCOX‑1 and COX‑2Ceach of which
appeared to have several distinct functions. Scientists believed that COX‑1
affected the synthesis or production of prostaglandins responsible for
protection of the stomach lining, whereas COX‑2 mediated the synthesis or
production of prostaglandins responsible for pain and inflammation.  This
belief led scientists to hypothesize that Aselective@ NSAIDs designed
to inhibit COX‑2, but not COX‑1, could offer the same pain relief
as non-selective NSAIDs with a reduced risk of fatal or debilitating PUBs.  In
addition, scientists believed that such drugs might also prove beneficial for
the prevention or treatment of other conditions, such as Alzheimer=s disease and
certain cancers where evidence suggests that inflammation may play a causative
role.  In light of these scientific developments, pharmaceutical companies
began developing new drugs known as ACOX‑2
inhibitors@ or Acoxibs.@  Merck developed
a COX‑2 inhibitor and named it Vioxx.

A.  Development and Marketing of Vioxx 

On November 23, 1998, Merck submitted a new drug
application for Vioxx to the Food and Drug Administration (AFDA@) and requested an
expedited review of its application. Six months later, on May 20, 1999, the FDA
approved Vioxx as safe and effective for treatment of osteoarthritic pain,
menstrual pain, and acute pain based on the data and label supplied by Merck. 

1.       Clinical
Trials

Vioxx was subjected to a number of studies and tests both
before and after its initial approval.  Dr. Nancy Santanello is a physician
researcher and the executive director of the epidemiology group at Merck
Research Labs (AMRL@), a division of
Merck that researches and develops new medications.  She supervised the
clinical trials and epidemiology studies of Vioxx until it was removed from the
market in September 2004.  Dr. Santanello testified that in developing a new
drug, Merck conducts three phases of clinical trials.  In Phase One, the drug
is tested on healthy individuals to determine how well it is absorbed and
tolerated.  In Phase Two, the drug is tested on individuals who have the
disease that the drug is designed to prevent or treat; in the case of Vioxx, it
was tested on patients with osteoarthritis.  In Phase Three, large clinical
trials are conducted to test the safety of the drug.  The FDA requires at least
two trials with consistent results in Phase Three before it will approve a new
drug.  There were 54 clinical trials conducted for Vioxx prior to its approval
by the FDA.  These clinical trials showed no statistically significant
difference in cardiovascular events between Vioxx and a placebo, or between
Vioxx and traditional NSAIDs.








Dr. Santanello testified that Dr. Garret Fitzgerald, a
researcher at MRL, conducted Phase One research into the renal effects of
Vioxx.  In measuring urinary output of patients taking Vioxx, Dr. Fitzgerald
found a decrease in prostaglandin metabolites, indicating the possibility of an
imbalance of prostacyclin and thromboxane.  Dr. Fitzgerald theorized that Vioxx
creates an imbalance between thromboxane and prostacylcin in the blood
vessels.  Thromboxane promotes platelet aggregation, vessel constriction, and
proliferation of smooth muscle cells.  Prostacyclin, by contrast, opposes the
action of thromboxane inhibiting platelet aggregation, facilitating
vasodilation, and preventing proliferation of smooth muscle cells.  In blocking
COX-2, Vioxx also blocks prostacyclin; therefore, Dr. Fitzgerald hypothesized,
the inhibition of COX-2 promotes an imbalance of prostacyclin and thromboxane
in the blood vessels, leading to the formation of blood clots.  In 1998, Merck
made the FDA advisory board aware of the Fitzgerald hypothesis.  The FDA
concluded that while the hypothesis was a theoretical concern, there was no
evidence that it was true. 

Dr. Santanello also testified that Merck recognized the
concerns raised by the Fitzgerald hypothesis and conducted several studies
designed to determine whether Vioxx had a biochemical effect on the cardiovascular
system.  As a result of Dr. Fitzgerald=s hypothesis,
Merck created a AStandard Operating Procedure for the
Surveillance Monitoring and Adjudication of Acute Thromboembolic Vascular
Events in Clinical Trials of COX-2 Specific Inhibitors.@  As part of the
standard operating procedure, Merck assembled groups of independent physicians
with expertise in thromboembolic events to monitor their clinical trials to
determine whether patients taking Vioxx experienced an increase in those
events.  Dr. Santanello testified that even after the FDA had approved Vioxx
for treatment of osteoarthritis, acute pain and menstrual pain, Merck continued
to study Vioxx for the treatment of other conditions.  

2. 
VIGOR Trial








In March of 2000, Merck received the preliminary results of
the Vioxx Gastrointestinal Outcomes Research (AVIGOR@) study.  VIGOR
was an 8,000‑patient trial designed to assess the relative incidence of
gastrointestinal PUBs in rheumatoid arthritis patients treated with Vioxx as
compared to those treated with the drug naproxen.  The VIGOR trial was
conducted with a 50-milligram dose of Vioxx, twice the approved dosage for
osteoarthritis.  The results of the VIGOR trial revealed that, after nine
months of daily 50-milligram doses, of the 4,000 patients taking Vioxx, 20 had
suffered a thromboembolic event; of the 4,000 patients taking Naproxen, four
had suffered a thromboembolic event.  Merck did not immediately remove Vioxx
from the market after receiving these results because it was unclear whether
Vioxx lead to the thromboembolic events, or whether Naproxen had helped prevent
such events.  While VIGOR demonstrated that patients taking Vioxx suffered
fewer serious gastrointestinal PUBs than patients taking Naproxen, it also
showed that patients on Vioxx suffered a statistically significant increase of
serious cardiovascular thrombotic events[1]
compared to patients taking Naproxen.

3. 
Additional Clinical Trials

At the time of the VIGOR trial, two studies were
simultaneously conducted on Alzheimer=s patients to
determine if Vioxx could treat the inflamation associated with Alzheimer=s disease.  Those
studies differed from the VIGOR trial in that the control group was taking a
placebo, not Naproxen.  In those studies, half the patients took 25 milligrams
of Vioxx, and the other half took a placebo.  The results of those studies
showed that fewer thromboembolic events had occurred in the patients taking
Vioxx than in those taking a placebo.  As a result of those studies, Merck
determined that the VIGOR results were caused by Naproxen=s alleged
cardioprotective effect.  In a press release dated March 27, 2000, Merck
released the results of the VIGOR study stating that patients on Vioxx had a
lower incidence of serious gastrointestinal events and that patients on
Naproxen had a lower incidence of serious thromboembolic events.  The press
release explained the higher incidence of thromboembolic events was due to
Naproxen=s cardioprotective
effect.








4.       Merck=s Marketing and
Distribution of Vioxx 

David
Anstice is president of Merck=s Human Health Division for Canada, Latin America, Japan,
Australia, and New Zealand.  Until December 2002, he was president of the Human
Health Division for the Americas.  In that position, he was responsible for
sales and marketing activities.  He testified that in the late 1990's, sales of
Pepcid were a significant source of revenue for Merck.  The patent was due to
expire in either 2000 or 2001, and Merck was looking to drugs like Vioxx to
maintain that level of revenue.  Merck engaged in what Anstice described as a Arace@ with Searle Pharmaceuticals,[2]
later Pfizer Searle, to put a COX-2 inhibitor on the market.  In marketing
Vioxx, Merck decided to distribute more free samples of Vioxx than they had
distributed for any previous drugs.  In one year, Merck spent over $300 million
to market Vioxx.  In 2002, Merck sold two and a half billion dollars worth
of Vioxx, its second best selling drug. 

Ernst introduced into evidence an email sent from a stock
analyst in which Merck=s Vioxx studies were analyzed.  The
analyst stated that in looking specifically at arthritis patients, the analysis
revealed that Vioxx-treated patients experienced a higher incidence of
cardiovascular events compared to patients given a placebo in both rheumatoid
arthritis and osteoarthritis studies.  The analyst further expressed suspicion
of Merck=s explanation that
Naproxen was cardioprotective.  In the email, the analyst stated that the FDA
had concluded that the heterogeneity of the studies included in Merck=s meta-analysis
obscured relevant facts.  Edward Scolnick, Merck=s lead scientist,
forwarded the analyst=s email to David Anstice.  In the message
to Anstice, Scolnick stated, ADavid, if he says this I will boil him in
oil at the meeting.  I have never seen any analyst provide data analysis on his
own.  I think merck [sic] should do something about him.@  








Ernst questioned Dr. Santanello about several marketing
issues surrounding Vioxx and warning letters issued by the FDA.  First, Ernst
asked Dr. Santanello about a warning letter written by Thomas W. Abrams,
director of the Drug Marketing, Advertising, and Communications division of the
FDA to Raymond V. Gilmartin, President and Chief Executive Officer of Merck. 
The letter stated that it was written in response to a promotional campaign for
Vioxx that Aminimizes the potentially serious cardiovascular
findings that were observed in the [VIGOR] study, and thus, misrepresents the
safety profile for Vioxx.@  The letter requested that Merck take
immediate corrective action including Aceasing all
violative promotional activities, and the dissemination of violative
promotional materials for Vioxx,@ and issuing a ADear Healthcare
provider@ letter to correct
false or misleading impressions or information.  The FDA=s letter stated
that there were no adequate and well-controlled studies of Naproxen supporting
Merck=s claim of
cardio-protection.  The FDA warned Merck not to minimize the risks associated
with Vioxx use and to correct the misrepresentation in the medical community. 
Dr. Santanello testified that Merck took the allegations seriously and acted
upon them.[3] 








Dr. Santanello further testified about a second letter sent
by the FDA to Merck.  In that letter, dated December 15, 1999, the FDA
addressed two Ahomemade promotional pieces,@ entitled ATen Reasons Why
Vioxx is Better than Celebrex,@ and AVioxx vs. Celebrex
Poem.@  In the letter,
the FDA warned that the promotional materials misrepresented the safety profile
for Vioxx and were lacking in fair balance.  The FDA stated that the Ahomemade@ promotional
pieces misrepresented the gastrointestinal safety profile of Vioxx and
improperly represented that Vioxx was more effective than Celebrex.[4]          The
letter also referred to audio conferences being given by a physician.  The
letter noted that Merck had misrepresented the number of heart attacks suffered
by study participants who were taking Vioxx.  The FDA further stated that Merck=s suggestion that
COX-2 inhibitors have an overall safety profile that is superior to other
NSAIDs is misleading.  In
response, Merck terminated its relationship with the physician and requested
that he not produce further conferences.  Merck also disseminated a letter to
health care providers explaining that the statements made by the physician were
not accurate.  The FDA reviewed Merck=s corrective actions and determined
that the matter had been Asatisfactorily resolved.@ 

In a letter dated July 16, 1999, the FDA=s Division of Drug
Marketing, Advertising, and Communications asked Merck to immediately cease
certain broadcast advertisements for Fosamax, and a print advertisement for
Vioxx.  The Vioxx advertisement represented an X-ray image of a hand with
superimposed red markings at the joints.  The FDA stated that the advertisement
should cease immediately because it failed to (1) provide adequate information
regarding the product=s usage, (2) include risk information, and
(3) present a brief summary of necessary information related to side effects,
contraindications, and effectiveness, or provide adequate provision for the
dissemination of full product labeling in connection with the broadcast
advertisement.  Ernst also questioned Dr. Santanello about a warning letter
Merck received concerning promotional materials for drugs other than Vioxx.  In
it, the FDA warned Merck about issuing a press release that was false or
misleading with regard to the cardiovascular safety profile of Vioxx.  The FDA
described Merck=s description of Vioxx=s favorable
cardiovascular safety profile as Asimply
incomprehensible.@    








Ernst introduced into evidence a letter dated January 22,
2001, addressed to the president of Merck and written by Dr. James Fries, a
professor of medicine at the Stanford University Medical Center.  Dr. Fries was
a principal investigator for a National Institute of Health (ANIH@) funded data bank
called Arthritis, Rheumatism, and Aging Medical Information System (AARAMIS@).  The
organization worked toward reducing the frequency of serious gastrointestinal
events from traditional NSAIDs and believed that the COX-2 inhibitors were the Abest approach
toward better drug safety in this area.@  Dr. Fries
received a telephone call from Dr. Louis Sherwood of Merck expressing concern
over lectures given by Dr. Gurkirpal Singh of ARAMIS, which were reported to be
Aanti-Merck and
specifically anti-Vioxx.@  Dr. Fries wrote, ADr. Sherwood
suggested that if this continued Dr. Singh would >flame out= and there would
be consequences for myself and for Stanford.@  Dr. Fries wrote
to express his concerns about underemphasized drug toxicity problems with
Vioxx, especially at the 50-milligram dose.  He also expressed concern that
Merck was engaging in Adamage control by intimidation.@  The letter
further expressed concern with the issue of Asuppression of
data by Merck and a consistent pattern of intimidation of investigators by
Merck staff.@[5]

The jury also viewed three television advertisements for
Vioxx, none of which  warned of the cardiovascular risks of taking Vioxx.  Dr.
Santanello testified that the advertisements were approved by the FDA and, at
the time the advertisements were published, Merck believed the VIGOR results
were skewed by the cardio-protective effects of Naproxen.  Ernst introduced evidence
of a brochure used in Merck=s sales training sessions.  The brochure
is entitled, ADodge Ball Vioxx,@ and contains the
word ADODGE!@ written on the
front page.  The brochure addresses several objections physicians may have to
using Vioxx including, AI am concerned about the cardiovascular
effects of Vioxx.@  Dr. Santanello testified it was her
understanding that the marketing department used this brochure as a game to
teach the salespeople how to answer questions for physicians.  She stated that
despite its name, the technique had Anothing to do with
dodging questions.@  








Ernst also showed a sales instruction video in which sales
representatives were instructed that if physicians asked whether Vioxx caused
heart attacks, the representatives were to answer, A[t]hat is not
true.@  Sales
representatives were encouraged to tell physicians that their friends and
family members continued to take Vioxx even after negative news articles were
published in the New York Times and the Journal of the American Medical
Association.   

Ernst further questioned Dr. Santanello about a document used
by the marketing department to track physicians who prescribed
anti-inflammatory drugs.  The document listed physicians nationwide and the
sales representatives assigned to those physicians.  The intent was to Aneutralize@ the physicians
through various tactics including awarding grant money to physicians if they
agreed to prescribe Vioxx instead of other anti-inflammatories.  Sales
representatives received bonuses tied to the physicians= prescription
rates for Vioxx.  Dr. Santanello explained that the term Aneutralize@ referred to the
representatives= intent to educate the physicians on Vioxx
so they could be fair and balanced.  She further explained that it was common
for physicians to request financial support for their research from a number of
different industries.  

B.  Dr. Wallace Prescribes Vioxx to Mr. Ernst








Dr. Santanello testified that Merck subscribes to a service
that tracks every prescription a physician writes so it can target physicians
who are prescribing drugs other than those sold by Merck.  Dr. Brent Wallace,
the physician who prescribed Vioxx for Ernst, was on Merck=s list of high
NSAID prescribers who Ashould be detailed on Vioxx first.@  By August of
2000, Dr. Wallace=s new prescription share for Vioxx was up
to 45.9 percent.  Dr. Santanello=s testimony was
unclear as to what percentage Dr. Wallace had been writing prior to being
targeted.  On April 18, 2001, Merck sent a letter to Dr. Wallace explaining the
results of the VIGOR study.  Attached to the letter was the full VIGOR report
as published in the New England Journal of Medicine.  The letter stated that as
of February 2000, the rate of cardiovascular events in the VIGOR study was .4
percent.  In the subsequent final analysis, which included all events after the
February 2000 cut-off date, the rate of cardiovascular events was .5 percent. 
The VIGOR study reported the .4 and .5 percent rates referred to serious
thrombolic cardiovascular events, not all cardiovascular events.  Dr.
Santanello explained that serious cardiovascular events included heart attacks
and strokes, while all cardiovascular events encompassed high blood pressure,
congestive heart failure, and other events not necessarily involving a
thrombus, or blood clot.

On September 15, 2000, Dr. Wallace prescribed a daily
25-milligram dose of Vioxx to Bob Ernst to alleviate tendinitis pain in Ernst=s hands.  On May
6, 2001, approximately one hour after Ernst went to bed, appellee noticed that
he was unconscious and was having trouble breathing.  Appellee called emergency
medical personnel and began cardiopulmonary resuscitation (ACPR@).  Ernst never
regained consciousness and was pronounced dead shortly after arriving in the
emergency room.  An autopsy was performed the following morning, and the report
listed his death as cardiac arrhythmia secondary to coronary atherosclerosis.  

On September 23, 2004, an external safety board monitoring
the results of a separate long‑term study entitled Adenomatous Polyp
Prevention on Vioxx (AAPPROVe@), which was
designed to assess whether Vioxx could help prevent the recurrence of
precancerous colon polyps, informed Merck that the interim data from this study
also showed a significantly increased rate of cardiovascular events in the
Vioxx arm as compared to the placebo arm of the study.  One week later, on
September 30, 2004, Merck voluntarily withdrew Vioxx from the market.

C.  Trial Court Proceedings 

Appellee, Carol Ernst, sued Merck alleging that the
ingestion of Vioxx caused the death of her husband.  Ernst=s suit was tried
to a jury, which found that the design and marketing of Vioxx was defective,
that Merck=s negligence proximately caused Ernst=s death, and that
the harm to Ernst resulted from malice attributable to Merck.  The jury awarded
a total of $24,450,000 in compensatory damages and assessed $229,000,000 in
exemplary damages.  Pursuant to section 41.008 of the Texas Civil Practice and
Remedies Code, the trial court reduced the assessment of exemplary damages and
entered judgment for appellee in the sum of $26,100,000.  From that judgment,
Merck appeals.








Merck
raises four issues in which it challenges the legal and factual sufficiency of
the evidence to support the jury=s verdict on causation, strict
liability, negligence, malice, and damages.  Merck further contends that the
trial court erred in instructing the jury and in admitting certain evidence.  

II.  Analysis

In its first issue, Merck argues that appellee failed to
present legally sufficient evidence of specific causation.  At trial, Ernst
alleged that Mr. Ernst=s death was caused by a blood clot
triggered by Vioxx.  The trial court excluded all evidence of non-thrombotic
causes of Ernst=s death.  Merck argues that Ernst failed
to present competent evidence of the existence of a clot.

The test
for legal sufficiency Amust always be whether the evidence at trial would enable
reasonable and fair‑minded people to reach the verdict under review.@  City of Keller v. Wilson,
168 S.W.3d 802, 827 (Tex. 2005).  Legal‑sufficiency review in the proper
light must credit favorable evidence if reasonable jurors could, and disregard
contrary evidence unless reasonable jurors could not.  Id.  Although the
reviewing court must consider evidence in the light most favorable to the
judgment, and indulge every reasonable inference that would support it, if the
evidence permits only one inference, neither jurors nor the reviewing court may
disregard it.  Id. at 822.  We sustain a legal-sufficiency challenge
when the record discloses one of the following situations: (1) complete absence
of evidence establishing a vital fact; (2) the court is barred by rules of law
or of evidence from giving weight to the only evidence of a vital fact; (3) the
evidence offered to prove a vital fact is no more than a mere scintilla; or (4)
the evidence conclusively establishes the opposite of a vital fact.  Id.
at 810. 








A
thrombotic cardiovascular event is a myocardial infarction or sudden cardiac
death triggered by a thrombus, or blood clot.  The autopsy report reflected
that Ernst suffered mild to severe atherosclerosis in the left anterior artery
and left circumflex coronary arteries and listed the cause of death as Acardiac arr[h]ythmia secondary to
coronary atherosclerosis.@  Both parties= experts testified that the usual
cause of a myocardial infarction is a blood clot formed in response to a
rupture or fissure of atherosclerotic plaque in the inner lining of the
artery.  It is undisputed that no blood clot or fissure of atherosclerotic
plaque was found during the autopsy.

A.  Ernst=s Evidence

Admitting
that there is no direct evidence of a blood clot, Ernst contends that there is
sufficient circumstantial evidence to support the jury=s verdict.  Prior to trial,
the court held a hearing on several pretrial motions including Merck=s motion to
exclude evidence based on Merrell Dow Pharm. v. Havner, 953 S.W.2d 706
(Tex. 1997).  No evidence was introduced at the hearing, but the court heard
arguments of counsel.  Merck=s counsel explained several medical terms
that would be used at trial beginning with Aatherosclerosis,@ which is the
disease that involves deposition of plaque on the walls of the arteries,
sometimes referred to as Ahardening of the arteries.@  When
atherosclerosis becomes advanced, a piece of plaque can rupture, and the body
responds by forming a Athrombus,@ or Ablood clot,@ around the
plaque.  If that clot breaks away, it will often block, or occlude, a blood
vessel leading to a Amyocardial infarction,@ commonly known as
a heart attack.  Counsel further explained that Acardiac arrythmia@ is Aessentially an
electrical problem with the heart.@  Finally, the
term Asudden cardiac
death@ refers to the
death of an individual usually within a certain period of time after the onset
of symptoms.  Sudden cardiac death encompasses both myocardial infarction and
cardiac arrythmia.

After hearing arguments of counsel, the court permitted
Ernst=s expert testimony
on causation, but excluded all evidence of non-thrombotic causes of Mr. Ernst=s death.  The circumstantial evidence on
which Ernst relies is the testimony that a clot could have been present, then
could have disappeared through various means prior to autopsy.  Appellee
presented the testimony of three experts who testified that Vioxx caused Ernst=s death: Dr. Isaac Wiener, Dr. Maria
Araneta, and Dr. Benedict Lucchesi.








Dr. Isaac Wiener

Dr.
Isaac Wiener is a practicing cardiologist who specializes in cardiac arrhythmia
and testified that cardiac arrhythmia refers to rhythm abnormalities that occur
in the electrical system of the heart.  He is a clinical professor of medicine
at the University of California at Los Angeles.  He conducts peer review for
the Journal of the American College of Cardiology, the American Heart Journal,
and the Journal of Arrhythmias. and has published several articles on cardiac
arrhythmia.  

Dr.
Wiener explained for the jury how the heart works as a pumping muscle to
circulate blood throughout the body.  He further explained the electrical
system that acts as a natural pacemaker for the heart.  The heart uses
electrical signals to ensure that it beats correctly. If the electrical system
is interrupted, an arrhythmia occurs.  If the arteries in the heart are
blocked, the heart will not get enough oxygen and will suffer abnormal rhythm. 
A thrombus, or blood clot, can block an artery causing a lack of oxygen, or
ischemia, to the heart.  An Aacute ischemic event@ occurs when the heart suddenly does
not get enough blood.

In Dr.
Weiner=s opinion, Ernst=s arrhythmia was Acaused by ischemia, by inadequate
blood flow to the heart.@  Because Ernst died suddenly after the onset of symptoms, no
reliable test could be performed to determine whether he suffered a myocardial
infarction.  Dr. Weiner admitted that the medical examiner, in conducting the
autopsy, found no evidence of recent or remote infarction or a thrombus.  The
cause of Ernst=s arrhythmia according to the autopsy report is coronary
atherosclerosis.  The most common predisposing factor to sudden cardiac death
is coronary atherosclerosis.  In explaining how Vioxx contributed to Ernst=s death, Dr. Wiener testified:








[I]schemic
ventricular fibrillation, sudden cardiac death, the most common thing that
causes sudden cardiac death, that causes someone to just keel over the way Mr.
Ernst, unfortunately, did is ventricular fibrillation, which is an abnormal
heart rhythm related to blockages in his artery.  And that=s what he had.  And does the only time it happen[s] is
to people taking Vioxx?  No.  Unfortunately it happens to people not taking
Vioxx.  But the evidence suggests that Vioxx makes it significantly more
common.

Dr. Maria Araneta

Dr.
Maria Araneta, the assistant medical examiner who performed the autopsy,
testified that Ernst=s left coronary arteries were 50- to 75-percent blocked by
calcified plaque.  She did not find a blood clot when she performed the autopsy
on Ernst=s body.  She did not see evidence of
a myocardial infarction, or heart attack, because Ernst died within an hour of
initially showing symptoms.  To affirmatively diagnose a myocardial infarction,
the physician must observe either death of the heart muscle tissue or the
presence of cardiac enzymes.  To observe either death of the tissue or the
presence of cardiac enzymes, the individual must have lived six to eighteen
hours after suffering the myocardial infarction.[6]


The most
likely cause of Ernst=s arrhythmia, Dr. Araneta testified, was an acute ischemic
event.  As the potential cause of such an event, she said, ASomething blocked that artery that
was already narrowed, either a clot, a fissure, block or ruptured atheroma,
none of which I saw, but it B these things could be dissolved.@  According to Dr. Araneta, the clot
could have spontaneously dissolved, been dislodged through vigorous CPR, or
could have been too small to detect on autopsy.  Not only did she not see a
clot, but she observed no rupturing or fissuring of the atherosclerotic plaque
in the coronary arteries.  In fact, the plaque in Ernst=s arteries was intact and so hard
that the arteries had to be de-calcified before they could be sectioned for
autopsy.  If she attempted to section the arteries prior to de-calcification,
her knife would have been broken due to the hardness of the arteries.  Contrary
to her report, at trial Dr. Araneta was Aleaning towards more likely than not@ that Ernst suffered a myocardial
infarction.      








Dr. Benedict
Lucchesi

Dr.
Lucchesi is a professor of pharmacology at the University of Michigan and
testified that he has an undergraduate degree in pharmacology, a master=s in physiology and a doctorate in
pharmacology and has researched arrhythmia since the 1950's.  He participated
on the team that invented the first pacemaker, another team that invented the
nitroglycerin patch, and another team that invented the first beta-blocker. 

Dr.
Lucchesi testified as follows:  Ernst had atheromatous plaque formed on the
inside walls of his arteries.  This is common among people 59-years-old as
Ernst was because as individuals age, cholesterol causes build-up of plaque in
the arteries.  Relying on the theories behind the Fitzgerald Hypothesis, Dr. Lucchesi
testified that when COX-2 is inhibited as with Vioxx, blood platelets can
aggregate around an area in the artery where plaque has formed.  By disturbing
the balance of prostacyclin and thromboxane in the blood, Athe potential for the platelets to
aggregate@ is increased.  Vioxx can be taken by many people without difficulty, but
should not be taken by patients with underlying cardiovascular disease.








Dr. Lucchesi
admitted that Ernst did not suffer a myocardial infarction, but speculated that
he could have suffered reperfusion injury when a blood clot, which was never
found, dissolved.  Reperfusion injury occurs when the heart has been ischemic
and blood flow suddenly returns to the heart.  Microemboli, which are small
blood clots that move, can cause reperfusion because the flow of blood to the
heart is intermittent.  Prior to his death, when Ernst said he was not feeling
well, he was most likely suffering from microemboli.  Dr. Lucchesi=s reperfusion theory is based on a
study performed on animals and published in Circulation Journal, which states
that Athe causal involvement of microemboli
in death from malignant arrhythmias and/or cardiac failure remains unclear.@  Dr. Lucchesi admitted there was no
evidence of microemboli in Ernst=s autopsy, but stated that, A[O]ne of the possibilities why a clot
could not be found is because the efforts to administer CPR could have
dislodged that clot and sent it somewhere, elsewhere, where it could not be
localized and observed.@  He admitted that he is not aware of any case reports that
suggest that CPR can dislodge a clot. 

He
opined that Ernst Adied of an arrhythmia, precipitated by a transient ischemic
event leading to ventricular fibrillation.@  Dr. Lucchesi explained that
ischemia is a lack of blood flow.  Most likely, because Ernst was taking Vioxx,
he died due to a temporary interruption of blood flow based on platelet
aggregation due to the inhibition of COX-2.  Although there was no evidence
that the temporary interruption of blood flow was due to a clot, Dr. Lucchesi
testified that blood clots can naturally dissolve through the process of
fibrinolysis.  Although all experts testified that the process of fibrinolysis
ends at death, Dr. Lucchesi testified that when an individual dies, all his
blood clots, and then, over a period of time, the blood turns to liquid again. 


Ernst
had the most severe atherosclerosis in the anterior descending coronary
artery.  He also showed moderate to severe calcific atherosclerosis in the left
circumflex coronary artery.  AMr. Ernst=s demise was caused by an arrhythmia initiated by ischemia.@  Ernst had coronary disease, but was
able to continue vigorous exercise because the coronary arteries have a Atremendous reserve capacity.@  Because Vioxx blocks COX-2 and Ain view of the fact that he had
underlying vascular disease, which makes him a candidate, along with Vioxx, for
such a serious event, my only conclusion would be that Vioxx contributed
significantly to this.@  

Dr.
Lucchesi did not rule out coronary atherosclerosis as the cause of Ernst=s arrhythmia.  Ernst argues that
because Mr. Ernst=s atherosclerosis was Aasymptomatic,@ it was ruled out as a cause of his
death.  In that regard, Dr. Lucchesi testified that Mr. Ernst Ahad a normal-looking heart except for
the disease within the coronary arteries, which are asymptomatic.@  He further explained that the term Aasymptomatic@ refers to the fact that Ernst was
able to continue vigorous exercise and an active lifestyle in spite of moderate
to severely clogged arteries.








B.  Merck=s Evidence

In
support of its contention that there was no evidence Ernst suffered a
thrombotic event, Merck presented the testimony of Dr. Thomas Wheeler and Dr.
Craig Pratt.

Dr. Thomas Wheeler

At the
time of trial, Dr. Wheeler was the interim chairman of the pathology department
at the Baylor College of Medicine.  He testified that autopsies are performed
to determine the cause of death, and, in some cases, the manner of death.  In
determining the cause of death when sudden cardiac death occurs, the medical
examiner first rules out all causes other than the heart.  When those causes
have been ruled out, the physician focuses on a careful examination of the
heart.  Approximately 85 percent of individuals who die from sudden cardiac
death have severe atherosclerosis.  At least half of the people who have severe
atherosclerosis do not experience symptoms.  In some of those people, death is
the first symptom of the disease.

During
life, risk factors for heart disease play a role in helping a physician determine
whether a patient needs to have a risk assessment, but, for an autopsy, risk
factors mean nothing.  In an autopsy the physician can see the cause of death
such that risk factors do not come into play.  Myocardial infarctions are
diagnosed by determining a patient=s symptoms, measuring cardiac
enzymes, or measuring electrical impulses in the heart through an
electrocardiogram.  None of those tests is effective after death.








In
reviewing Dr. Araneta=s autopsy report, Dr. Wheeler reviewed the microscopic slides
of tissue taken from the organs at the time of the autopsy.  In his opinion,
the autopsy was thoroughly performed in a professional manner.  He agreed with
Dr. Araneta=s finding that the cause of death was cardiac arrhythmia secondary to
coronary atherosclerosis.  Fatal arrhythmias can and do occur without a
myocardial infarction.  According to the autopsy, Ernst=s arrhythmia was caused by severe
atherosclerosis.  Ernst=s heart showed signs of prior ischemic episodes.  Dr. Wheeler
saw no evidence of plaque rupture or fissure, which is necessary for a thrombus
to form.  In conducting the autopsy, Dr. Araneta made slices of the arteries
that were one to two millimeters thick, which is the best way for a pathologist
to find a clot. Despite a thorough examination of very thin slices of Ernst=s coronary arteries, Dr. Araneta did
not find a blood clot.  If a clot had been present, she would have been able to
see it.

It is
not at all uncommon to find on autopsy severe atherosclerosis, but no clot or
myocardial infarction.  With the degree of atherosclerosis Ernst experienced in
two coronary arteries, he was susceptible to an arrhythmia at any time.  The
artery in which Ernst experienced severe atherosclerosis is the one most
associated with sudden death.  The plaque had been building up in Ernst=s arteries for decades.  Blood clots
form in arteries when plaque cracks and ruptures causing the contents of the
plaque, i.e., cholesterol and other material, to get into the bloodstream, which
causes the clot to begin to form.  Calcific plaque, the type that was in Ernst=s arteries, is least likely to
rupture or fissure to initiate a blood clot.  One would ordinarily not expect a
blood clot to form, but if a clot were to form around such plaque, there would
be evidence, even if the clot dissolved or moved, of a rupture and a hemorrhage
into the plaque at the point of rupture or fissure.

Because
Dr. Araneta cut the arteries in such thin sections, the fact that she did not
find a clot essentially rules out the possibility of a clot=s having caused Ernst=s death.  The clot could not have
dissolved after death.  The scenario described by Dr. Lucchesi in which all of
the blood in the body clots and then dissolves could only occur if the body had
not been preserved as Ernst=s body was at the funeral home.  If a clot were there, it
would not have dissolved, but would have been preserved.  








Dr.
Wheeler testified that the possibility of paramedics breaking up a clot through
CPR is Aa preposterous notion.@  There is no support in scientific
or medical literature for such a theory.  He has neither independently learned
of CPR dislodging or fragmenting a clot, nor has he read any anecdotal case
reports supporting the theory.  After hearing Dr. Araneta=s and Dr. Lucchesi=s testimony, he researched the
possibility of CPR=s dislodging a clot and found no scientific or medical
support for the theory.  Even if CPR could theoretically have dislodged a clot,
it could not have dislodged a clot in Ernst=s arteries because the calcified
plaque made his arteries too hard to succumb to pressure from CPR
compressions.  In other words, if Dr. Araneta=s knife could not cut the arteries,
they could not have succumbed to pressure of CPR compressions to the degree
that a possible blood clot could have been dislodged.  Not only is there no
scientific support for the theory, but Dr. Wheeler opined, AI don=t think it makes sense from an
anatomic standpoint as well.@

As to
the theory of the clot breaking into small pieces, a blood clot is not brittle,
but is supple, like a piece of bubble gum, making it almost impossible to break
into small pieces.  Further, Dr. Wheeler examined Dr. Araneta=s slides, and, if the clot had broken
into several tiny pieces, he would have been able to see them under the
microscope.  Dr. Wheeler re‑examined the small arteries in the heart
after hearing plaintiff=s experts= testimony, and, again did not see evidence of a clot.  Not
only was there no clot, but there was no rupture or fissure of the
atherosclerotic plaque necessary to formation of a clot.  Dr. Wheeler opined
that Ernst=s death was caused by severe atherosclerosis, which led to a fatal
arrhythmia.

Dr. Craig Pratt

Dr.
Craig Pratt is the director of the coronary care unit at Methodist Hospital, a
professor of medicine at Baylor College of Medicine, and the director of
research at the DeBakey Heart Center.  He testified that ischemia is an
imbalance in the heart muscle that results from a significant blockage in one
of the coronary arteries.  Atherosclerosis is a process in which blockage
builds up on the inside of arteries, frequently leading to ischemia. 
Clot-busting drugs are very effective, but usually take 60 to 90 minutes to
dissolve, or lyse, a clot.  








Ernst
had moderate to severe stenosis in two of his coronary arteries.  The extent of
the blockage in Ernst=s arteries was not known until after his death. 
Atherosclerosis in the coronary arteries is the most common foundation for
ventricular fibrillation, which is the type of arrhythmia that caused Ernst=s death.  The experts agree that
cardiac arrhythmia can occur without a blood clot.  With regard to cardiac risk
factors, Dr. Pratt testified, ARisk factors are something that matter when someone is
alive.  Once we know at autopsy they have moderate to severe atherosclerosis,
then whether or not they were identified adequately in life really doesn=t matter.@  

Within
reasonable medical probability, Ernst died of ventricular fibrillation brought
on by moderate to severe atherosclerosis.  The atherosclerosis led to an
ischemia, which triggered the life-threatening arrhythmia.  The paramedics
found evidence of very broad ventricular tachycardia and ventricular
fibrillation.  There is no evidence at all that Ernst had a myocardial
infarction.  Patients who die within one hour of the onset of symptoms are much
more likely to have ventricular fibrillation due to ischemia, not due to
myocardial infarction.  A[T]he number-one primary driver of his arrhythmia event was
his severe underlying atherosclerosis.@  It is Aimpossible to imagine@ that the body=s natural clot-dissolving system,
which ordinarily takes 24 to 48 hours to dissolve a clot, would have impacted
Ernst=s situation.  Vioxx did not play a
role in Ernst=s death.

C.  Legal Sufficiency of the Evidence on Specific Causation  








Causation in toxic tort cases is discussed in terms of
general and specific causation.  Havner, 953 S.W.2d at 714.  General
causation describes whether a substance is capable of causing a particular
injury or condition in the general population, while specific causation
describes whether a substance caused a particular individual=s injury.[7] 
Id.  In many cases, as in this case, it is impossible to present direct
evidence that the substance caused a litigant=s injury.  Id.
at 715.  Proving one type of causation does not necessarily prove the other,
and both are needed for a plaintiff in a toxic-tort suit to prevail.  Coastal
Tankships U.S.A., Inc. v. Anderson, 87 S.W.3d 591, 602 (Tex. App.CHouston [1st
Dist.] 2002, pet. denied).  A[T]o survive a legal sufficiency review, a
claimant must do more than simply introduce into evidence epidemiological
studies that show a substantially elevated risk.  A claimant must show that he
or she is similar to those in the studies.@  Havner,
953 S.W.2d at 720.  In the case of Vioxx, the claimant must show he suffered
the injury Vioxx is alleged to cause, i.e., a thrombolic cardiosvascular
event.  Further, if there are other plausible causes of the injury or
conditions that could be negated, the plaintiff must offer evidence excluding
those causes with reasonable certainty.  Id. 

Each expert who testified on the issue of specific
causation testified that Ernst=s death was caused by an Aacute ischemic
event.@  In reciting her
experts= testimony as
evidence of causation, Ernst equates an Aacute ischemic
event@ with a Aclot.@  The two terms
are not equivalent.  Ernst=s own expert, Dr. Weiner, defined an
acute ischemic event as Aevents where suddenly the heart doesn=t get enough blood.@  There are several possible causes
of ischemia; not all are caused by blood clots.  Even Ernst=s experts testified that arrhythmias
can occur without thrombotic causes.  Dr. Weiner testified that, AArrhythmias can occur completely
unrelated to heart attacks.@  Dr. Araneta testified that A[ventricular fibrillation] by itself
[is] not a clotting problem.@

Ernst
further relies on the testimony of Dr. Egilman, who testified that Vioxx was a
contributing cause to Ernst=s death.  In explaining how Vioxx contributed to Ernst=s death, Dr. Egilman explained, AThe Vioxx got into his blood.  It was
in his blood at the time he had his heart attack.  It prevented the blood
thinner from unclogging a clot or prevented it from plaquing, and that he had a
heart attack because of not enough oxygen getting by when he had a clot.@  Dr. Egilman=s testimony assumes that (1) a clot
was found, and (2) Mr. Ernst suffered a heart attack, or myocardial
infarction.  Because there was no evidence of clot or myocardial infarction,
Dr. Egilman=s conclusion is based on a false assumption.








Another
of Ernst=s experts, Dr. Weiner, testified that
Vioxx was a Asignificant contributing factor@ in Ernst=s death.  Dr. Weiner=s testimony was based on the fact
that, in his opinion, Ernst Ahad a cardiac arrest.  And this is part of the spectrum of
acute ischemic events B in other words, events where suddenly the heart doesn=t get enough blood.@  Dr. Weiner also testified that
Ernst=s arrhythmia was caused by ischemia,
or an inadequate blood flow to the heart.  Dr. Weiner=s opinion assumes, without evidence,
that the inadequate blood flow was caused by a clot.  Further, Dr. Weiner
admitted that he could not testify with certainty that Ernst suffered a
myocardial infarction.  He also admitted that the autopsy report contained no
evidence of a clot.

Ernst also relies on circumstantial evidence that a clot
could have been present, then could have disappeared through various means
prior to the autopsy.  In claims supported by only meager circumstantial
evidence, the evidence does not rise above a scintilla if jurors would have to
guess whether a vital fact exists.  City of Keller, 168 S.W.3d at 813. 
When the circumstances are equally consistent with either of two facts, neither
fact may be inferred.  Id.  When the circumstantial evidence of a vital
fact is meager, we must consider not just favorable but all the circumstantial
evidence, and competing inferences as well.  Id. at 814.  Therefore, we
address the circumstantial evidence that although a clot was not found, it
could have existed, then disappeared.

First, Dr. Araneta opined that a clot could have naturally
dissolved through a process called fibrinolysis.  However, Dr. Araneta admitted
that she would not expect a clot to naturally dissolve after death.  Dr.
Lucchesi explained that certain types of clots could naturally move through the
blood vessels, but did not specify how quickly this process could take place in
the body.  Contrary to Dr. Araneta=s and Dr. Lucchesi=s testimony, Dr.
Pratt testified that the possibility of a clot dissolving on its own was not a
viable hypothesis because the natural process of fibrinolysis takes 24 to 48
hours and only continues while the patient is alive. 








Next, Dr. Araneta and Dr. Lucchesi speculated that vigorous
CPR could have dislodged a blood clot or caused it to fragment into such small
pieces that it could not be detected on autopsy.  Dr. Araneta testified that
emboli could have been dislodged and fragmented into such small pieces that she
could not have seen them on her microscope.  She described this theory as a Aguess,@ her Aestimate,@ and a Apossibility.@  Dr. Lucchesi
admitted that he was aware of no published literature suggesting that CPR could
dislodge or move clots.  

To be considered reliable circumstantial evidence of
causation, an expert=s opinion must be independently evaluated
to determine whether the opinion is reliable.  Havner, 953 S.W.2d at 713B14.  An expert=s bare opinion
will not suffice to support a jury=s verdict.  Id.
at 711.  The substance of the testimony must be considered.  Id. 
Factors to which a reviewing court should look in determining the reliability
of scientific testimony are: (1) the extent to which the theory has been or can
be tested; (2) the extent to which the technique relies upon the subjective
interpretation of the expert; (3) whether the theory has been subjected to peer
review and/or publication; (4) the technique=s potential rate
of error; (5) whether the underlying theory or technique has been generally
accepted as valid by the relevant scientific community; (6) the nonjudicial
uses that have been made of the theory or technique; and (7) any other factor
that is helpful to determine the reliability of the scientific evidence.  Id.
at 714 (citing E.I. duPont de Nemours and Co. v. Robinson, 923
S.W.2d 549, 557 (Tex. 1995)).  Causation opinions based on possibility,
speculation, and surmise are no evidence.  Havner, 953 S.W.2d at 711B12.  Expert
opinions must be supported by facts in evidence, not conjecture.  Marathon
Corp. v. Pitzner, 106 S.W.3d 724, 729 (Tex. 2003).  








Dr. Araneta=s and Dr. Lucchesi=s opinions are not
supported by scientifically reliable facts in evidence.  Ernst=s experts
postulate that Mr. Ernst suffered a thrombotic cardiovascular event, but at the
time of his death, less than one hour later, the thrombus had been dislodged
and fragmented into such small pieces that it could not be seen under a
microscope.  Because there is no evidence that a clot existed and was
dislodged, the experts= opinions are mere speculation.  Moreover,
we cannot disregard Dr. Wheeler=s uncontroverted testimony that there is
no support in scientific or medical literature for such a theory.  We also
cannot disregard Dr. Wheeler=s uncontroverted testimony that Mr. Ernst=s atherosclerosis
would have prevented the arteries from succumbing to CPR compressions.  Dr.
Araneta testified that Mr. Ernst=s arteries were so
hardened by atherosclerosis that they had to be soaked in acid before she could
slice them for examination.  Dr. Wheeler explained that if Mr. Ernst=s arteries were so
hard that they would have broken Dr. Araneta=s knife, the
arteries could not have succumbed to the pressure of CPR compressions to the
degree that a possible blood clot could have been dislodged.  

Appellee points to Dr. Araneta=s testimony that
she rarely finds a clot on autopsy; therefore, appellee argues, the failure to
find a clot does not rule out the possibility of a myocardial infarction.  Dr.
Araneta=s testimony,
however, referred to cases in which the autopsy revealed pathological evidence
of myocardial infarction, i.e., dead or obviously infarcted muscle
tissue.  Every expert agreed that Ernst died too suddenly for his heart muscle
tissue to show signs of death.  Moreover, the trial court excluded any evidence
that ingestion of Vioxx is associated with non-thrombotic cardiovascular events
because the theory was not supported by scientifically reliable evidence. 
Ernst directs our attention to Dr. Araneta=s and Dr. Lucchesi=s opinions that Asomething@ triggered the
ischemic event suffered by Mr. Ernst.  However, there is no competent evidence
that a blood clot triggered by Vioxx ingestion was the Asomething@ causing his
death.








Ernst
argues in her motion for rehearing that A[t]he statement that there is no
direct evidence of a myocardial infarction is misleading because Mr. Ernst died
of a sudden cardiac death.@  By making this statement, appellee seems to imply that
sudden cardiac death is always the result of a myocardial infarction.  Appellee=s own expert, Dr. Weiner, explained
that sudden cardiac death is a general term meaning simply that a person died
within six hours of the onset of symptoms.  Death can result from arrhythmia,
myocardial infarction, or other means related to the heart.  Ernst cites Merck=s expert, Dr. Wheeler, as stating
that sudden cardiac death is cardiac arrest.  Dr. Wheeler=s testimony, however, is no evidence
that Ernst suffered a thrombotic event or even that he suffered a myocardial
infarction.  In the testimony referred to, appellee=s attorney recited the Merck manual
definition of cardiac arrest as Aabsent or inadequate ventricular
contraction[.]@  Dr. Wheeler agreed with that definition of cardiac arrest and explained
that it encompassed many cardiac events, not just myocardial infarction.  He
also agreed that some doctors use the terms Acardiac arrest@ and Asudden cardiac death@ interchangeably.  He did not
testify, however, that Ernst suffered a myocardial infarction triggered by a
blood clot.

D.  Differential Diagnosis

Appellee argues that she introduced some evidence of
specific causation based on the process of differential diagnosis.  A
differential diagnosis is a clinical process whereby a doctor determines which
of several potential diseases or injuries might have caused the patient=s symptoms by
ruling out possible causes.  Coastal Tankships, 87 S.W.3d at 604.  In a
differential diagnosis, a doctor compares a patient=s symptoms to
symptoms associated with known diseases, conducts physical examinations of the
patient, collects data on the patient=s history and
illness, and then analyzes that data until reaching a final diagnosis and makes
a decision on how to properly treat the patient=s injury or
illness.  Id.  In the case of an autopsy, unlike a differential
diagnosis, the medical examiner is not confined in her analysis to observable
outward symptoms; she is able to examine and test vital organs.








Appellee contends that the failure to find a blood clot
does not defeat causation, arguing that Dr. Lucchesi ruled out all
non-thrombotic causes of Ernst=s arrhythmia through the use of
differential diagnosis.  Dr. Lucchesi testified that Ernst was under 65 years
old, exercised regularly, had not smoked for more than 15 years, and did not
have a family history of heart disease.  Ernst contends that by ruling out
other potential risk factors for sudden cardiac death, the evidence is legally
sufficient to show that Mr. Ernst suffered a myocardial infarction triggered by
a blood clot.  Dr. Lucchesi=s testimony that Ernst did not exhibit
risk factors for cardiovascular disease does not reasonably support the
conclusion that he suffered a thrombotic cardiovascular event. 

Appellee
misapprehends the nature of differential diagnosis.  This diagnostic process
does not contemplate the consideration of risk factors; it is a consideration
of symptoms and potential causes.  In arguing that there is some evidence
through the use of differential diagnosis, Ernst argues that her medical experts
excluded all other risk factors for heart attack except the AVioxx factor.@  A differential diagnosis requires
the exclusion of the likely causes until the most probable one is
isolated.  Praytor v. Ford Motor Co., 97 S.W.3d 237, 244B45 (Tex. App.CHouston [14th Dist.] 2002, no pet.). 
Appellee argues Athe experts were able to exclude all risk factors for heart
attacks except twoChis gender and his daily intake of Vioxx.@  The exclusion of
risk factors, however, does not equate to the exclusion of causes.  Further, we
cannot ignore Dr. Pratt=s and Dr. Wheeler=s uncontradicted
expert testimony that risk factors have no application after death.  Once an
autopsy is performed, risk factors are not used to rule out potential causes of
death. 

Further, no expert ruled out atherosclerosis as a cause of
Ernst=s arrhythmia.  If
there are other plausible causes of the injury or condition that could be
negated, the plaintiff must offer evidence excluding those causes with
reasonable certainty.  Havner, 953 S.W.2d at 720.  As part of her burden
on specific causation, Ernst was required to offer evidence excluding other
causes of Mr. Ernst=s death with reasonable certainty.  Id. 
Ernst contends that Dr. Lucchesi ruled out atherosclerosis as a cause of Ernst=s death because he
testified that his atherosclerosis was Aasymptomatic.@  However, Dr.
Lucchesi and several other experts explained that the term Aasymptomatic@ referred to Mr.
Ernst=s ability to
vigorously exercise and continue his daily routine without suffering symptoms
of atherosclerosis such as fatigue, shortness of breath, and chest pain.  








III.  Conclusion

The epidemiological evidence supports the conclusion that
Vioxx use at a certain dose and duration is associated with an increased risk
of thrombotic cardiovascular events.  The experts= speculation that
a clot Acould have@ existed, but Acould have@ dissolved, been
dislodged, or fragmented gives rise to nothing more than conjecture.  Facts
from which an inference may properly be drawn must be established by direct
evidence, not by other inferences.  Entex v. Gonzalez, 94 S.W.3d 1, 8
(Tex. App.CHouston [14th Dist.] 2002, pet. denied) (Aa vital fact may
not be established by piling inference upon inference@).  Crediting all
favorable evidence that reasonable jurors could believe and disregarding all
contrary evidence except that which they could not ignore, we find no evidence
that Mr. Ernst suffered a thrombotic cardiovascular event, i.e., a
myocardial infarction triggered by a blood clot.  Accordingly, Ernst failed to
show that the ingestion of Vioxx caused her husband=s death.  Merck=s first issue is
sustained.[8]

The judgment of the trial court is reversed and judgment is
rendered that appellee take nothing.

 

/s/      Adele Hedges

Chief Justice

 

Panel consists of
Chief Justice Hedges and Justices Anderson and Brown.

 









[1]  ACardiovascular
thrombotic events@ are events such as strokes and myocardial infarctions
caused by blood clots.





[2]  Searle Pharmaceuticals developed Celebrex.





[3]  On June 16, 1998, one year prior to the approval of
Vioxx, Merck received a warning letter from the FDA stating that Merck had engaged
in Aa continuing pattern and practice of widespread
corporate behavior to avoid compliance with the regulations concerning the
disclosure of risk information.@  The letter
referred to Apromotional materials for a variety of products,@ and stated that those materials suggested Aa corporate policy toward minimizing the presentations
of [risk] disclosures.@ 





[4] One of the homemade promotional pieces addressed in
the letter was a poem designed to tout the superiority of Vioxx over Celebrex. 
In its warning letter, the FDA stated that the poem Amakes a broad superiority claim comparing Vioxx not
only to the class of NSAIDS, of which it is a member, but to all analgesic and
anti-inflammatory therapies available for the management of pain.@  The FDA described this Aglobal superiority claim@ as Afalse or misleading.@  Merck agreed that the homemade promotional piece was wrong and
removed it from distribution.





[5]  The trial court admitted the letter for the limited purpose of showing
notice to Merck, not for the truth of the matters contained therein.





[6]  All experts agreed on this conclusion.





[7]  There is some evidence that Vioxx use at a certain dose and duration is
associated with an increased risk of thrombotic cardiovascular events.  After reviewing the evidence and considering the
appropriate standard of review, we conclude there is some evidence to support a
finding of general causation.





[8]  Because Merck=s
first issue is dispositive, we need not address its remaining issues or the
issues raised in appellee=s cross-appeal.